UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA WISE, a Michigan resident,

        Plaintiff,

  v.

OTTAWA COUNTY, a municipal corporation
and governmental subdivision organized and
existing under the laws of the State of
Michigan; OTTAWA COUNTY FRIEND OF
THE COURT; JENNELL L. CHALLA,
Director of the Ottawa County Friend of the
Court; MATTHEW J. SCHMID, Assistant
Friend of the Court - Field Services for Ottawa
County; KEVIN J. BOWLING, Prior Circuit
Court Administrator; 20TH JUDICIAL
CIRCUIT COURT FOR THE COUNTY OF
OTTAWA, and HON. JON A. VAN
ALLSBURG, Chief Judge of the Ottawa
County Circuit Court;

        Defendants.

Hon. _____

Case No. 1:22-cv-00352

| | |
|---|---|
| Joshua Wise | Ottawa County, 20th Circuit Court, et al |
| 7658 Sunrise Bluff Ln | 414 Washington Ave |
| Zeeland, MI 49464 | Grand Haven, MI 49464 |
| Telephone: 616-403-1541 | Telephone: 616-846-8320 |
| Joshwise84@gmail.com | Joshwise84@gmail.com |
| *Plaintiff* | *Defendant* |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Joshua Wise, for his complaint against defendants, states as follows:

## THE PARTIES

1.     Plaintiff is a Michigan resident residing in Ottawa County, Michigan.

2.       Defendant, Ottawa County (hereafter sometimes referred to as the "County" or the "defendant County") is a municipal corporation and governmental subdivision organized and existing under the laws of the State of Michigan. The defendant County operates and funds County departments and instrumentalities, including the Ottawa County Friend of the Court, and the Ottawa County Circuit Court. At all relevant times the County of Ottawa was plaintiff's employer, with ultimate control over his hiring and firing, conditions of his employment, benefits, and oversight of the management and operation of the relevant human resource functions, exercised in conjunction with the 20th Circuit Court.

3.       Defendant, Ottawa County Friend of the Court (the "OCFOC" or "defendant OCFOC") is an instrumentality of the defendant County; and part of the defendant's Circuit Court Family Division. The OCFOC was who Plaintiff worked for and whose Collective Bargaining Agreement ("CBA") Plaintiff was operating under.

4.       Defendant, Jennell L. Challa, is and was at all relevant times the Director of the defendant OCFOC/20th CC. She is named in her official-capacity and her individual capacity.

5.       Defendant, Matthew J. Schmid, is and was at all relevant times the Assistant Friend of the Court - Field Services for the defendant OCFOC/20th CC ("defendant Schmid"). He is named in his official-capacity and his individual capacity.

6.       Defendant, Kevin J. Bowling, was at all relevant times the Circuit Court Administrator for the defendant 20th CC ("defendant Bowling"). He is named in his official-capacity and his individual capacity.

7.       Defendant, Hon. Jon A. Van Allsburg, (hereafter, "defendant Van Allsburg" or "Judge Van Allsburg"), is the Chief Judge of the Ottawa County Circuit Court. He is named in his official-capacity and in his individual capacity.

2

8.      Defendant, Ottawa County 20th Circuit Court, (the "20th CC" or "defendant CC") is the Circuit Court for the County of Ottawa, and is the Circuit Court under which the Ottawa County Friend of the Court is a division of. The 20th Circuit Court was a party to the CBA that governed conduct between the Plaintiff and employer.

## JURISDICTION AND VENUE

9.   This is a civil rights action in which the plaintiff seeks relief for the violation of rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments. Jurisdiction of this Court is found upon 28 U.S.C. § 1331. Plaintiff's complaint also asserts claims under state law, including the Michigan Veterans Preference Act; the Michigan Employee Right to Know Act and wrongful discharge without "good cause" contrary to the CBA and other breach of contract terms under the CBA. In terminating plaintiff, defendants violated the MVPA and the due process clause of the 14th Amendment by depriving him of his constitutionally protected property interest in employment.  Accordingly, plaintiff is entitled to reinstatement to his former employment; declaratory relief indicating that he cannot be terminated absent a hearing and that the failure to provide such a hearing constitutes a continued due process violation; and damages from the named defendants who are sued in their individual capacities.

10.  Venue is proper in the Western District of Michigan pursuant to 28 U.S.C § 1391(b) because the acts, events or omissions giving rise to this action occurred in this District. Plaintiff worked for defendants in Ottawa County where defendants do business.

11.  Plaintiff also seeks compensatory damages and reasonable attorneys' fees and costs, as authorized by 42 U.S.C. §§ 1983 and 1988.

12.      Because plaintiff's federal and state claims arise from *a common nucleus of operative facts*, this Court has supplemental jurisdiction over plaintiff's state law claims pursuant

3

to 28 U.S.C. § 1367 as those claims form part of the same case and controversy under Article III of the United States Constitution.

## GENERAL ALLEGATIONS
### *Summary of Plaintiff's Case*

13. Plaintiff, a U.S. Army Veteran, began working at the defendant OCFOC in 2005 at age 20.  Fourteen years later, he was summarily fired on Monday, April 15, 2019.  He filed a grievance as well as a protest and demand for the procedural protections in the MVPA and procedural due process.  All his demands and his grievance were ultimately denied by defendant Van Allsburg in a Final Decision issued on June 13, 2019.

14. At all relevant times, plaintiff's employment was subject to a "good cause" standard as contained in a Collective Bargaining Agreement ("CBA") between the Ottawa County 20th Judicial Circuit Court and the Friend of the Court Employees Association (the Friend of the Court Employees Association is hereafter sometimes referred to as the "FOCEA" or the "Union"). Among other things, the CBA provides that an employee may not be terminated without "good cause and notice." (Art. XXIV, Sections 2(a)).  This "good cause" standard is contractual.

15.    None of plaintiff's alleged acts and/or omissions (between his last performance review on December 3, 2018 and the termination of his employment on about April 15, 2019) violated any of defendants' then existing policies, practices and/or customs. Contrary to defendants' false, contrived and wholly unsupported allegations, plaintiff's performance evaluations for 2014, 2015, 2016 and 2018 do not reflect "a pattern of poor professional judgment, impulsiveness, and policy violations." He received no performance evaluation in 2017.

16.    Among other federal and state statutory protections, plaintiff was entitled to procedural due process as a public employee with a property interest in continued employment by

virtue of the "good cause" standard for terminations under the CBA as well as his rights as a veteran under the MVPA. Among other protections, he was entitled to a pre-termination hearing *followed by a "meaningful" post-termination hearing* where he has the assistance of counsel, the right to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him.

17.    Unfortunately, plaintiff was not afforded any due process at all. Neither plaintiff nor his counsel were afforded access to an extensive portion of the documents bearing upon the issues or the accusations leveled against plaintiff and they were not permitted to call or cross-examine witnesses at any hearing. Defendants failed to provide notice to plaintiff of any performance issues to provide him with an opportunity to improve his performance. Stated differently, defendants used the performance allegation as a basis to discipline plaintiff even though plaintiff was unaware that his performance was at issue.

18.    Among other deficiencies during the pre and post-termination process, plaintiff was not provided with many of the documents ultimately relied upon by defendant Van Allsburg in his "final" decision on plaintiff's grievance, including but not limited to:

- Documents, including emails, pertaining to the four "Cases" identified and discussed at pages 7 through 9 of the Final Decision;

- The "most recent three years of records" kept by defendant Schmid, Assistant Friend of the Court (plaintiff's supervisor), of the monthly FOC Bench Warrant Team, relied upon extensively by defendant Van Allsburg in reaching his Final Decision to deny plaintiff's grievance. *Plaintiff has never been provided with these records.*

- The "Security Incident Reports" (signed by defendants Challa, Bowling, and Schmid and OCFOC employee Kathy Winston) sent to MDHHS on March 15, 2019, April 8, 2019, and April 11, 2019, respectively. Plaintiff was provided with these Reports were attached as Exhibit 9 to defendant Van Allsburg's final Decision on Grievance, but otherwise these were never provided.

19.     Moreover, the so-called "hearings" and the entire process was an utterly futile exercise because the outcome was predetermined.  The decision to terminate plaintiff's access to the Michigan Child Support Enforcement System (MiCSES) had already been made as of his receipt of the Notice of Disciplinary Hearing on Friday, April 12, 2019. According to defendants, the termination of plaintiff's access to MiCSES necessarily required the termination of his employment. Contrary to defendants' contrived allegations, the "Security Incident Reports" (signed by OCFOC employee Winston and defendants Challa, Bowling, and Schmid and sent to MDHHS on March 15, 2019, April 8, 2019, and April 11, 2019, respectively) were created without any input from plaintiff.

20.     These "Security Incident Reports" convey false, unsupported conclusions about security issues which misrepresent the security protocols supposedly in force at the OCFOC's offices.  The termination of plaintiff's employment was an accomplished fact prior to his actual termination date of April 15, 2019 and any subsequent "hearing" process was an absolute farce.

21.     The extraordinary nature (and number) of the procedural due process violations that led to plaintiff's wrongful termination were deliberately caused, orchestrated and carried out by the defendants.  They culminated in the issuance of defendant Van Allsburg' s Final Decision which denied plaintiff's grievance; his request for a full-blown hearing under Loudermill and his protest/demand for treatment under the Michigan Veterans Preference Act.

### Plaintiff's Job; and Job Performance

22.     Plaintiff began working at the defendant OCFOC in 2005 as an "FOC Clerk I." He was promoted to FOC Investigator in 2008. He was assigned to the Bench Warrant Team as an FOC Bench Warrant Investigator in 2012. *(The Bench Warrant Team is hereafter sometimes*

*referred to as the "BW Team")*.  For the past six years leading up to his termination on April 15, 2019, plaintiff reported directly to defendant Schmid, Assistant Friend of the Court.

23.     As of 2012, the BW Team was comprised of two FOC Bench Warrant Investigators (including plaintiff), three deputies assigned to the BW Team by the Ottawa County Sheriff's Office, and defendant Schmid, Assistant Friend of the Court and plaintiff's direct supervisor.  Prior to February 2017, an Ottawa County Sheriff's Deputy had been assigned as the "point person" for contacts between the BW Team and the Department of Homeland Security U.S. Customs and Enforcement Agency ("ICE").   Among other things, this Ottawa County Deputy received information from ICE and relayed information back to ICE concerning persons.

24.     In 2017, that Deputy was re-assigned (by the Ottawa County Sheriff) to other duties and plaintiff became the point person for contacts with ICE. Defendants acknowledge and it is undisputed that in his role as Bench Warrant Investigator, plaintiff's job also included periodic contact with ICE.

25.     Plaintiff had been specifically deputized by the Ottawa County Sheriff to avoid the exact issue that led to Plaintiff's termination. Defendant refuses to investigate or acknowledge this claim. Defendant has created a barrier in Plaintiff providing evidence to support this claim. A simple review of the deputization paperwork could answer this question. Additionally, if Plaintiff could call witnesses and introduce evidence, it would support Plaintiff's claims, but Defendant purposely and knowingly did not allow this to happen because it did not support their agenda and end result that they wanted to accomplish.

26.     Plaintiff denies defendants' claim that he misused data from MiCSES and/or that he disclosed it to ICE personnel.  Having said that, defendants are fully aware that it was a regular and consistent process for OCFOC personnel to use MiCSES to assist in criminal investigations

unrelated to child support, as well as to use information contained with MiCSES to obtain information to ascertain whether individuals found therein have outstanding warrants with other governmental  agencies; and defendants' personnel have regularly and consistently checked individuals coming into the OCFOC office for both appointments and hearings for warrants unrelated to child support. This happened every day. The only reason it is suddenly now an issue is because it involves ICE which does not fit Defendant's agenda of what is important. Defendant is cherry picking this issue because it involves ICE. Defendants refuse to acknowledge that this has been done for years with other law enforcement agencies, and Defendant refused to allow Plaintiff to calls witnesses very likely because the witnesses that will corroborate that this has been a regular practice at the OCFOC are endless. Defendants and other OCFOC personnel have made arrangements with other law enforcement agencies to apprehend individuals on warrants when they came to OCFOC offices. They have also assisted process servers in this way. Defendant Schmid regularly had BW Team members assist in criminal investigations for other law enforcement agencies using child support systems to assist in location. Numerous times these people had no FOC case at all, and sometimes they did, but the criminal investigation was completely unrelated to child support. Defendant Schmid knew that this was done regularly. And numerous times it was done at his direction. None of the preceding uses pertain to child support matters. Defendants consistently ignore and avoid this fact. They find issue with only this "unauthorized use" as it pertains to ICE. If Plaintiff were allowed to call witnesses and introduce evidence it would support this, and that is another reason Defendants want so badly to prevent Plaintiff from calling witnesses and introducing evidence.

27.     Contrary to the Court's Final Decision, plaintiff's contacts with ICE personnel over the past two years were known to plaintiff's direct supervisor, defendant Schmid; and they were

discussed at the meetings of the BW Team. Plaintiff (and the BW Team) met with defendant Schmid weekly for a period of time, then phased to twice a month, then recently phased to once a month. During the past six years, defendant Schmid has seen plaintiff in the office after 5 pm working on (for instance) out of state arrests. Despite the contrary, unsupported findings of defendant Van Allsburg, defendant Schmid has observed ICE personnel in the FOC offices. Defendant Schmid has personally witnessed ICE agents in the OCFOC office. They were usually in plain clothes. One time Schmid specifically asked who was in Plaintiff's office, and Plaintiff informed him they were ICE agents. Defendant Schmid never expressed any issues or concerns with that. Yet another reason Defendants want to prevent Plaintiff from introducing evidence and calling witnesses. Defendant Schmid is aware that plaintiff's cell phone number was provided to the jail as the point of contact for "issues" pertaining to warrants.

28.     During the BW Team meetings, the members also discussed the late-night calls to plaintiff's phone, problems with confirming warrants after business hours, the fact the jail calls plaintiff at night, etc. Defendant's IT installed a specific app on plaintiff's computer so plaintiff could access the MiCSES system while not in the office. Defendant Schmid is the one who had it installed on these devices for plaintiff's use outside the office. Defendant Schmid was well aware that Plaintiff regularly and consistently worked after hours and had to access MiCSES from home. Defendant Schmid contacted Plaintiff numerous times while on vacation to ask for assistance with cases which required Plaintiff to access MiCSES from outside of the office. Defendant Schmid's assertion that this is not true is absolutely false.

29.     Defendants' contention that because Plaintiff signed forms verifying his agreement "to use the Child Support  Systems to perform only my IV-D child support job functions and not

to perform any other functions not permitted under IV-D regulations, does not change the fact that he did not disclose such information.

30.     Plaintiff's job performance significantly improved with every year. Since his last job performance evaluation on December 3, 2018, plaintiff had not been disciplined, warned or otherwise advised that his job was/is in jeopardy. In fact, the comments by his direct supervisor contradict the notion that the termination of plaintiff's employment was warranted.

### Events Leading to Plaintiff's Wrongful Termination

31.     During a hastily called meeting with plaintiff's immediate supervisor (defendant Schmid); the Circuit Court Administrator (defendant Bowling) and the Friend of the Court Director (defendant Challa) on or about February 25, 2019; plaintiff was asked about his interactions with ICE.  Plaintiff replied that he contacts ICE to confirm when someone is deported and to find out what they (ICE) are doing in a given case; and they contact him from time to time.

32.     The Court Administrator concedes that the meeting on February 25, 2019 was called without prior notice of its reason or purpose.  He claims plaintiff replied that he only contacted ICE to confirm deportation. Defendants maintain that this latter reply by plaintiff was a lie.  Defendant Schmid attended the meeting and the grievance hearing on Wednesday, May 15, 2019. He was fully aware of precisely what plaintiff was doing from day to day and concerning Plaintiff's interaction with ICE. Defendant Schmid never denied Plaintiff's statements that he (Matt Schmid) was intimately aware of Plaintiff's activities from day to day and week to week. Plaintiff believes notes from this meeting taken by those in attendance will show that Plaintiff did elaborate on the reasons for contacts with ICE, but again Plaintiff has been prohibited from access to these documents.

33.     Plaintiff was given no warning or notice of the hastily called February 25, 2019

meeting, yet that meeting seems to form a large basis for the discipline and termination of Plaintiff.

Plaintiff was entitled to notification and an opportunity to have a union steward present during that

meeting if it could be construed as a meeting that could result in discipline. Seeing as that meeting

seems to be a large basis of Defendant's termination for Plaintiff, Plaintiff should have been

afforded protections to be aware of the purpose. Plaintiff would have been much more guarded in

answers and would have wanted to actually look at things instead of "shooting from the hip" and

trying to answer questions from scenarios that were a long time ago based on memory. Plaintiff

had no expectation that would be held against him and be held as an absolute truth going forward.

Plaintiff was not given proper notification of the intention or purpose of this meeting. Defendant

tries to hide behind the fact that this was not the intention of the meeting, but it is clear Defendant

had an agenda when that meeting was called. Defendant essentially surprise attacked Plaintiff and

then used the information provided by Plaintiff against the Plaintiff, despite Plaintiff repeatedly

saying he wasn't sure and would need to check his notes.

34.     As of December 2018, his immediate supervisor for the past six years (Defendant

Schmid) noted that Josh has "demonstrated … continuous positive performance" and referenced

the absence of "any reported incidence of inappropriate behavior..."  As of April 11, 2019, plaintiff

had not been warned or otherwise advised that his job was/is in jeopardy.

### Plaintiff Receives the "Notice of Disciplinary Hearing"

.

35.     On Friday, April 12, 2019, plaintiff received a "Notice of Disciplinary Hearing"

(the "NODH") from defendant Bowling with copies to defendants Van Allsburg, Challa, Schmid

and Ver Beek. According to the NODH, the hearing would be held on Monday, April 15, at 1:00

p.m. for the stated purpose of discussing "allegations against you, which may result in disciplinary measures up to and including termination of employment."

36.     The NODH contained generalized, unsupported allegations of supposed misdeeds for which plaintiff had never been disciplined.  Citing no underlying facts, the NODH posited four, severe *but wholly unsupported* accusations.

- Inappropriate and unauthorized access of MiCSES;
- Unauthorized release of confidential/sensitive data;
- Unauthorized usage of AWL system access; and
- Dishonesty with supervisors and court administration.

37.     The NODH identified four "Potential Violations" of Michigan IV-D Child Support Manual, Chapter 1.0, Section 1.10 Confidentiality/Security."   Without any explanation or reference to any factual basis, the NODH hypothesized that plaintiff had *somehow* violated the following sections:

- 1.1 Confidential Information;
- 7.1 Emailing Confidential Information; and
- 9.5 Disclosures to Law Enforcement Personnel.

38.      With *no explanation, specific examples and/or particularized account of relevant facts*, the NODH **merely restated** the following sections of "*Ottawa County's [Court's] Policy regarding Employee Behavior, Discipline and Rules of Conduct*":

- C.7. Carelessness;
- C.8. Insubordination;
- C.11. Any communication or action intended to threaten, intimidate or coerce another employee or a member of the general public;
- C.20. Falsifying records, reports, documents, or knowingly misrepresenting any information requested by supervision;

12

- C.23. Release of confidential information;

- C.33. Failing to comply with any provision in this Personnel Policy, with any provision of other Court and County Policies, or with any other rule and regulation applicable to the employee; and,

- C.35. Taking any other action which interferes with the proper performance of the employee's assigned work, or which would reflect discredit upon the Court and

- County, or engaging in any conduct or actions which give rise to justifiable public criticism.

39.    Even though plaintiff had never been previously warned or disciplined for any such infractions, the NODH falsely claimed that the preceding allegations:

> "were related to the previously repeated and inappropriate release of confidential information and failure to follow acceptable use policies that govern IV-D systems, specifically the release of information to non-IV-D law enforcement personnel on matters unrelated to administration of the IV-D program and lying to Court Administration when asked specifically about the unauthorized release of confidential information to law enforcement agents representing the DHS US Immigration and Customs Enforcement."

40.    As outlined in further detail below, the allegations in the preceding paragraph are false. Contrary to the NODH, plaintiff has never disclosed confidential information to ICE or any other agency in violation of any guideline, FOC directive, law or regulation. The information provided to ICE (per their request) was all publicly available information, (e.g., arrest data, court info, etc.).  Section 1.2 of the Michigan IV-D Child Support Manual Department of Human Services, defines confidential information as "…any information relating to a specified individual or an individual who can be identified by reference to one or more factors specific to him or her," including, but not limited to: "Social Security number; Residential and mailing addresses; Employment information; and Financial information." There is no evidence that plaintiff disclosed social security numbers, residential or mailing addresses, employment information and/or financial information or any other confidential/sensitive data information to ICE. Specifically, plaintiff never "repeatedly and inappropriately" released any "confidential information"; he had never

failed to follow "acceptable use policies that govern IV-D systems"; he had never "released information to non-IV-D law enforcement personnel on matters unrelated to administration of the IV-D program…".   And he had certainly never lied to Court Administration about such matters.

41.     The only other documentation referenced in the NODH was the April 12, 2019 letter from Erin Frisch, Director of the Michigan Office of Child Support ("MOCS"), to defendant Challa. While the Frisch Letter mentions defendant Challa's recent report of "multiple security violations" involving the "disclosure of confidential IV-D data to [ICE]…"   it fails to specify the precise information and/or explain why it meets the definition in "confidential." The Frisch Letter adds, "Based on your Security Incident Reports**,** OCS has determined that Mr. Wise disclosed IV-D data outside the administration of the IV-D program." While the Frisch Letter maintains that a violation has occurred "on more than one occasion," it fails to identify the "confidential information" purportedly disclosed by plaintiff.

42.     The NODH also informed plaintiff for the first time that *effective 5:00 PM, that same day,* his access to MiCSES would be terminated by the Michigan Office of Child Support. According to the NODH, the summary termination of his access to MiCSES was "[b]ased on the initial investigation by MDHHS regarding [his] violations of the Michigan IV-D Child Support Manual…"  Plaintiff had not been informed of or had any input into this so-called "investigation" by the MDHHS *which had culminated in the termination of his access to MiCSES*, a decision which had already been made as of his receipt of the NODH on Friday, April 12, 2019. This action was taken without his input and was an accomplished fact by the time he received the NODH on Friday, April 12, 2019.

**The "Disciplinary Hearing" on Monday, April 15, 2019**

43.     A so-called disciplinary hearing was held on April 15, 2019, at 1:00 PM to discuss charges against plaintiff.  Plaintiff assumed these would consist of the list allegations set forth in the NODH which he received on April 12, 2019. Unfortunately, the outcome of the hearing, i.e., the termination of his employment, was a foregone conclusion since, according to defendants Bowling and Challa, there was no other allowable outcome because Plaintiff's access to MiCSES was vital to performance of his job. During the hearing, virtually all the discussion centered around: (i) his alleged disclosures to ICE; and (ii) his work remotely from outside the office.

<u>**Plaintiff Receives the "Results of the Disciplinary Hearing"**</u>

44.     On Thursday April 18, 2019, Plaintiff received a document (dated 4.15.2019) entitled "Results of the Disciplinary Hearing" ("RODH") by email. [Ex. 6] The charges included "Violations of the Michigan IV-D Child Support Manual policies, resulting in MDHHS terminating access to MiCSES (based on MDHHS correspondence)." It also included several alleged violations of Ottawa County's [Court's] Policy regarding Employee Behavior, Discipline and Rules of Conduct but there was and has never been any specific identification of how or why he violated any of these alleged rules/policies.

45.     The Notice of Disciplinary Hearing and the Results of Disciplinary Hearing are distinctly different. The latter document contained allegations not included in the original notice or discussed at the hearing, including instances dating back as far as six years ago, including alleged acts for which plaintiff was never disciplined, never even talked to about, and plaintiff has subsequently received positive performance evaluations. Plaintiff also has a liberty interest in his good name and reputation which have been damaged by these allegations.

46.     The charges in the NODH and the RODH do not establish "good cause" for the summary termination of plaintiff's employment.  Among other blatant errors, the performance

record portrayed in the NODH and the RODH is not an accurate summation of Plaintiff's actual

track record – far from it - even a cursory glance at plaintiff's performance evaluations proves this

basic fact.   Unfortunately, plaintiff and his counsel did not have an extensive portion of the

documents bearing upon this issue and were not permitted to call witnesses at any hearing prior to

or following the termination of plaintiff's employment.

48.    Perhaps most troubling is the fact that the decision to terminate plaintiff's access to

MiCSES had already been made as of his receipt of the NODH on Friday, April 12, 2019.

### Neither Plaintiff's Performance Evaluations nor His Personnel File Reflect "A Pattern of Poor Professional Judgment, Impulsiveness, And Policy Violations…"

49. There was no basis for plaintiff's dismissal.   There is no continuing "pattern" of infractions of

increasing severity for which this employee was warned, then ultimately fired as the "last

straw." *The "examples" given (at page 2 of the RODH) were as follows:*

- **2/8/13** Poor judgment regarding inappropriate communication with the Governor's Office and MDOC regarding internal MDOC operations, resulting in a written reprimand that was later reduced to a coaching memo

- **8/2/13** Participating in ride-a-long with Deputy VanLiere, without supervisory approval or knowledge. The subsequent chase and tasing of the subject resulted in a physical injury for Deputy VanLiere and an incident with GRPD which was not properly notified of this activity in accordance with OCSO protocol.

- **4/17/17** Disciplinary Hearing resulting in suspension for harassment of co-workers and creation of a hostile work environment.

- **8/29/17** Denial of his AWL (Alternative Work Location) application due to recent disciplinary action.

50.  The preceding "examples" are approximately two years and six years old, respectively.  Each

one is a separate, unrelated circumstance.  In short, they are not a pattern. Two of the four, (i.e.,

*the "ride-a-long with Deputy VanLiere" supposedly "without supervisory approval or*

*knowledge" on 2.8.13; and the "Denial of his …Alternative Work Location… application due*

16

*to recent disciplinary action" on 8.19.17*), involved no discipline at all. They were not "disciplinary events" for lack of a better term and were not mentioned in Plaintiff's most recent performance review. *Three out of four are not referenced in Plaintiff's personnel file. Plaintiff's performance has significantly improved with every year that passed* and these ancient events have long since been overcome, addressed and/or improved upon. While there was a reference to some discipline in 2017, there is no question that plaintiff's subsequent performance evaluation (on 12.3.2018) clearly indicates that any such concerns are behind him.

51.    Since his last job performance evaluation on December 3, 2018, plaintiff has not been disciplined, warned or otherwise advised that his job was/is in jeopardy. In fact, the comments by his direct supervisor contradict the notion that the termination of Plaintiff's employment was warranted.

## Plaintiff Has Never Disclosed "Confidential" Information to ICE

52.    Without identifying a single piece of actual data, the NODH (dated 4.12.2019) charged plaintiff with the "repeated and inappropriate release of confidential information…to non-IV-D law enforcement personnel on matters unrelated to administration of the IV-D program." The following week, the RODH referenced his "unauthorized sharing [on 2/1/19]" of "court information" with ICE agents. But to date, defendants have not specifically identified a single item of "confidential information" which plaintiff supposedly obtained from MiCSES and disclosed to law enforcement personnel, including ICE.

53.    While the April 12, 2019 letter from Erin Frisch to "Ms. Janell Challa" mentions her [Ms. Challa's] recent report of "multiple security violations" involving the "disclosure of confidential IV-D data to [ICE]," it fails to specify the precise information and/or explain why it

17

meets the definition in "confidential."   Ms. Frisch's letter adds, "Based on your Security Incident Reports. OCS has determined that Mr. Wise disclosed IV-D data outside the administration of the IV-D program."   While the Frisch letter maintains that a violation has occurred "on more than one occasion," it fails to identify the "confidential information" purportedly disclosed by plaintiff.

54.     Contrary to the Notice of Disciplinary Hearing (the "NODH") plaintiff has never disclosed confidential information to ICE or any other agency in violation of any guideline, FOC directive, law or regulation. The information provided to ICE (per their request) was all publicly available information, (e.g., arrest data, court info, etc.).

55.     Section 1.2  of the Michigan IV-D Child Support Manual Department of Human Services,  defines confidential information as "…any information relating to a specified individual or an individual who can be identified by reference to one or more factors specific to him or her," including, but not limited to: "Social Security number; Residential and mailing addresses; Employment information; and Financial information."  There is no evidence that plaintiff disclosed social security numbers, residential or mailing addresses, employment information and/or financial information or any other confidential/sensitive data information to ICE.

56.     At the hearing, plaintiff explained (without contradiction) that he has regularly obtained information from MICA, a service which contains substantial information that MiCSES does not.

57.     Additionally, plaintiff explained that the information shared with ICE was all publicly available information from bond paperwork when an individual would bond out of jail. Although the information may also have been in MiCSES, it does not suddenly become more confidential because it is in MiCSES and that does not change the fact that it is a public record available elsewhere.

58.     Defendants have not identified a statute or regulation mandating that information that is otherwise public somehow becomes confidential just because it is also found on MiCSES. In fact, several "interface" programs feed into MiCSES.

59.     As of February 1, 2019, plaintiff had not been advised that such activity was somehow wrongful.  The following facts have not been disputed by Defendants:

- Matt Schmid, Plaintiff's direct supervisor was intimately aware of Plaintiff's activities from day to day and week to week.
- Defendant Schmid knew that Plaintiff was the point of contact with ICE following Deputy VanLiere's reassignment (roughly two years ago);
- Defendant Schmid knew Plaintiff he had been sharing information back and forth with ICE for some years
- Defendant Schmid was copied on many of the emails Plaintiff received back from ICE.
- Plaintiff's direct supervisor was present at all relevant meetings, including the hastily called meeting on February 25, 2019 and the grievance hearing on Wednesday, May 15, 2019

### Defendants Belatedly Issued Policies for Use Against Plaintiff

60.     The RODH also accused plaintiff of a "failure to follow acceptable use policies that govern IV-D systems State and local IV-D."  Federal regulations require that entities like the County FOC have written policies in place concerning the sharing of data with other persons. (Section 1.1 of the Michigan IV-D Child Support Manual Department of Human Services). As of February 1, 2019, the FOC had no such policies in place concerning contacts between FOC personnel and ICE.  In fact, no such policy existed until Ms. Challa's email to FOC Staff (on Wednesday, March 27, 2019), concerning contacts between FOC staff and ICE representatives. Ms. Challa's new policy recognized *that*

"There are occasions when a FOC employee may have contact with an agent of US Homeland Security via Immigration and Customs Enforcement (ICE). This contact may be initiated by FOC staff or may be initiated by an ICE representative. A supervisor should be notified prior to initiating any contact from the FOC to ICE even in circumstances where the purpose is to confirm deportation. If FOC staff are contacted by ICE for child support information, IV-D confidentiality and security policies should be followed regarding disclosures of information and a supervisor should be notified prior to any information being released. As always, FOC staff should also timely case note this contact in MiCSES."

61.     The preceding email is an attempt to create a policy – after the fact – to address all the perceived issues/concerns over FOC staff contacts with ICE.  Most importantly, this "policy" did not exist prior to February 1, 2019.  And yet, plaintiff was terminated because he allegedly violated its terms.  Even if true, he should not be held to an ex post facto, after the fact standard. Because his direct supervisor was aware of and supported all his interactions with ICE personnel and because he did not share any confidential information with ICE, he complied with her email both before and certainly after it's issuance.  In fact, it is undisputed that plaintiff had no contact with ICE between March 27, 2019 and the day he was fired.

62.     Defendants charge that plaintiff's "unauthorized sharing [on 2/1/19]" of "court information" with ICE somehow "resulted in**" the filing of MDHHS Security Incident Reports (on 4/8/19).[1] The RODH indicates that these reports are "attached" but plaintiff never received copies until the issuance of defendant Van Allsburg's Final Decision on June 13, 2019. According to defendants, the filing of these reports mandated the termination of Plaintiff's access to MiCSES – just as night follows day – simple cause and effect.  According to the NODH, the termination of his access was ostensibly **"[b]ased on the initial investigation by MDHHS regarding [his]

---

[1]The RODH states in relevant part: "4/8/19 MDHHS Security Incident Reports (see attached Security Incident Reports required by MDHHS Office of Child Support) – filed due to unauthorized access of MiCSES outside of normal business hours; unauthorized off-site access of MiCSES through unsecure Wi-Fi portals; unauthorized sharing of confidential IV-D information with ICE agents; and providing unauthorized access to the FOC office." See, Exhibit 4, at p.10 – which is p.2 of the RODH.

violations of the Michigan IV-D Child Support Manual." The preceding storyline constitutes one of the central underpinnings of the defendants' case against Plaintiff: *"We had no choice, once his access was cut off, he could no longer do his job...*" But this false narrative is problematic for a host of reasons.

63.     First, these reports were drafted and filed by the Ottawa County FOC herself*, not by the MDHHS*. The April 12, 2019 letter from Erin Frisch, (i.e., the "Frisch Letter"), to defendant Challa concerns "your [Ms. Challa's] recent report of multiple security violations involving Friend of the Court (FOC) Investigator Joshua Wise." In other words, the issuance *vel non* of these "Security Incident Reports" was/is in the hands of the local FOC – it is not the mechanical, knee jerk cause and effect progression we have been led to believe. Note that items #1 and #2 on page 1 of the Frisch Letter are quotes from the reports prepared and filed by Jennell Challa. They immediately follow Frisch's statement that "The Security Incident Reports {DHS-882) submitted on April 8, 2019, indicate violations involving…"

64.     Second, the decision to terminate plaintiff's access to MiCSES had already been made as of his receipt of the NODH on Friday, April 12, 2019. Before that, plaintiff knew nothing about it. Per the NODH (2nd to last paragraph, at page 2), his access was to be "summarily terminated effective 5:00 PM, April 12, 2019   by the Michigan Office of Child Support." This action was taken without his input and was an accomplished fact by the time he attended the disciplinary hearing on the afternoon of Monday, April 15, 2019.

65.     If she had consulted plaintiff, Ms. Challa would have learned that the information "shared" was not confidential and did not come from MiCSES at all.  But because he was not consulted or notified when Ms. Challa made a report to the State of Michigan on April 8, 2019,

plaintiff had no input into the State's decision to remove his computer access to MiCSES five days later.

66.     Contrary to the NODH and the RODH, the Michigan Office of Child Support did not base its decision to terminate plaintiff's access on his allegedly unauthorized access to IV-D data outside of the assigned IV-D workspace and without prior approval.   At page 2 of the letter from the Director of the Michigan Office of Child Support,  Ms. Frisch states that OCS "will continue reviewing the incident report regarding Mr. Wise's access to IV-D data outside of the assigned IV-0 work space and without prior approval (#2 on page 1 )" but then she emphasizes that "[u]ntil we've completed that review, our access removal decision is not based on that specific incident report."

<u>**Plaintiff's Alleged Off-Site Access to MiCSES through
"Unsecure WiFI Portals" is Not "Good Cause"**</u>

67.     Contrary to the NODH, plaintiff did not engaged in "inappropriate and unauthorized access of MiCSES..." The RODH incorrectly asserts that MDHHS Security Incident Reports were "filed due to [plaintiff's] unauthorized access of MiCSES outside of normal business hours"; his "unauthorized off-site access of MiCSES through unsecure Wi-Fi portals" and his " providing unauthorized access to the FOC office."  But according to the Director of the Michigan Office of Child Support, the OCS' "access removal decision [was] not based on that specific incident report." His last performance evaluation contains *no mention of any "inappropriate and unauthorized access of MiCSES."* Instead, it found that he has "elite Job knowledge of handling civil and felony warrants and usage of the MICSES system."

68.     Moreover, defendant Schmid authorized and enabled plaintiff's access while he was outside the office. Defendant Schmid specifically contacted Plaintiff while he was not working and asked him to work on numerous occasions, which defendant Schmid knew required Plaintiff

to access and utilize MiCSES outside of the office, and that was never a problem until Defendants suddenly were interested in finding a reason to terminate Plaintiff's employment.

69.     The fabricated allegation that plaintiff was not approved to work AWL and that he did not follow his supervisor's directive from 2/26/16 indicating his regular job responsibilities should be handled during his normal work hours (of Monday, Tuesday, Thursday and Friday from 7:00 am to 5:30 pm) is also a manufactured accusation. Defendants knew his time was being adjusted regularly to account for his after-hours work and that his work throughout each day of every week continued unchanged after he was denied the "AWL status."

70.      First, Plaintiff's Off-site" access was authorized in defendant Challa's email (dated March 4, 2016) which stated in part:

> "Regarding your remote work as part of an IT/FOC pilot project, you are permitted to work 2.5 hours per week remotely. Please log your time and adjust your schedule so that you are not working more than 40 hours per week. Also, please keep your Lotus notes updated so that staff know your work schedule. Matt will review this schedule in a few months to determine if it is working well for you and the office overall."

71.     Note the last line of the preceding email which places the oversight for plaintiff's remote work and his overall schedule squarely in the hands of defendant Schmid, At the direction of Schmid, plaintiff's hours were adjusted regularly to account for his after-hours work.  This was before and after the so-called "denial" of his work from home request, primarily because Plaintiff's duties were extensive – someone had to take care of the various, key tasks he was handing from day to day, week to week – often ten-hour days.  Plaintiff always picked up the slack and did what he was told to do.  He was never directed to stop, and the employer continued paying for his phone and letting him adjust his schedule every week to account for this.

72.     Second, defendant Schmid was fully aware that Plaintiff worked remotely because he (defendant Schmid) would contact Plaintiff while on vacation and at various times with

inquiries and ask Plaintiff to assist with a variety of matters.  He would often complement Plaintiff on his responsiveness; that no matter what time of day it was, he could always count Plaintiff to respond and if he didn't get a response quickly, he (defendant Schmid) would wonder if something was wrong.

### COUNT I — 42 U.S.C. § 1983:

### Fourteenth Amendment Procedural Due Process

73. Plaintiff incorporates all the above paragraphs as though fully set forth herein.

74.    Plaintiff had a "property interest" in his continued employment by virtue of the "good cause" standard for terminations under the CBA as well as his rights under the MVPA. Therefore, he was entitled to procedural due process as a public employee with a property interest in continued employment

75.    Plaintiff was not been afforded procedural due process. Both the pre-termination hearing and the post-termination hearing were a sham – a foregone conclusion that plaintiff was to be terminated. They were based on fabricated charges.  As the evidence finally produced by defendants shows, the Security Incident Reports were vague; failed to identify specific disclosures; they contained false information and were all prepared retroactively, after the fact, based on hearsay and driven in large part by defendant Bowling's long-standing desire to jettison plaintiff from the OCFOC.

76.    As the discharged employee, plaintiff was entitled to a meaningful post-termination hearing; he must be allowed "to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him."

77.     Additionally, it flies in the face of logic and reason that due process can be accomplished when the Chief Judge is responsible for approving any termination beforehand, and then the Chief Judge is also responsible for being the final decision maker in a "non-economic" grievance. Due process cannot be accomplished when you are allowing the ultimate decision maker to determine whether that decision is proper in the grievance procedure.

78.     In this case, Defendants are state actors subject to the Fourteenth Amendment. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

79. The municipal defendants and subdivisions are state-affiliated institutions acting under color of state law, unlawfully deprived plaintiff of his property interest by unilaterally and willfully terminating him without just cause, when the harm to Plaintiff from such action was foreseeable. Defendant's unilateral termination of Plaintiff' employment under such circumstances arbitrarily deprived Plaintiff of his property interest without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

80.     As a direct and proximate result of defendants' actions, Plaintiff has suffered economic and non-economic damages, including lost wages and benefits, pain, suffering, embarrassment and humiliation.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Award plaintiff all back and front wages, benefits, bonuses and other compensation due him as a result of the wrongful conduct of defendant;

B.  Award plaintiff compensatory, punitive and/or exemplary damages on him claims against defendant;

C.  Award plaintiff prejudgment interest;

D.  Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees; and

E.  Award plaintiff such other and further relief as this Court deems appropriate.

### COUNT II — 42 U.S.C. § 1983:
### Fourteenth Amendment Liberty Interest

81.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

82.    Plaintiff, as an employee of Ottawa County pursuant to a CBA and as a veteran, had a "property interest" in his continued employment.

83.     Defendant, a state-affiliated institution acting under color of state law, unlawfully deprived Plaintiff of his liberty interest by unilaterally and willfully terminating him in violation of the CBA, when the harm to Plaintiff from such action was foreseeable. Defendant's unilateral termination of Plaintiff' employment under such circumstances arbitrarily deprived Plaintiff of his liberty interest without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

84.    Plaintiff has a liberty interest that cannot be infringed. Defendants must provide an articulated standard of conduct which Plaintiff violated and an opportunity to rebut the charges in a meaningful way and at a meaningful time. Plaintiff has never been allowed that opportunity.

85.    Plaintiff should have the right to cross-examine and introduce witnesses, which Plaintiff has never received.

86.     Plaintiff also has a liberty interest in his continued employment pursuant to the procedure outlined in the MVPA which he was not afforded. Plaintiff has an interest in the statutes of the state of Michigan meaning something and being followed.

87.     As a direct and proximate result of defendant's actions, Plaintiff has suffered economic and non-economic damages, including lost wages and benefits, pain, suffering, embarrassment and humiliation.

WHEREFORE, plaintiff respectfully requests that this Court:

A. Award plaintiff all back and front wages, benefits, bonuses and other compensation due him as a result of the wrongful conduct of defendant;

B. Award plaintiff compensatory, punitive and/or exemplary damages on him claims against defendant;

C. Award plaintiff prejudgment interest;

D. Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees; and

E. Award plaintiff such other and further relief as this Court deems appropriate

## COUNT III — 42 U.S.C. § 1983:

### Fourteenth Amendment Constitutional Due Process

87. Plaintiff incorporates all the above paragraphs as though fully set forth herein.

88.     Plaintiff had a "property interest" in his continued employment by virtue of the "good cause" standard for terminations under the CBA as well as his rights under the MVPA. Therefore, he was entitled to constitutional due process as a public employee with a property interest in continued employment

89.     Plaintiff was not been afforded constitutional and procedural due process that he is entitled to. Both the pre-termination hearing and the post-termination hearing were a sham – a

foregone conclusion that plaintiff was to be terminated. They were based on fabricated charges. As the evidence finally produced by defendants (in the form of attachments to the final Grievance Decision) shows, the Security Incident Reports were vague; failed to identify specific disclosures; they contained false information and were all prepared retroactively, after the fact, based on hearsay and driven in large part by defendant Bowling's long-standing desire to jettison plaintiff from the OCFOC.

90.     As the discharged employee, plaintiff was entitled to a meaningful post-termination hearing; he must be allowed "to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him."

91.     Notably, Plaintiff has never had the opportunity to call witnesses and produce evidence on his own behalf. In fact, Plaintiff has been continuously stonewalled and not allowed access to documentation and evidence in Defendant's possession. Defendant has refused to provide information and documentation to Plaintiff.

92. Defendant refused to allow Plaintiff to call witnesses and introduce evidence at any step of the process. This refusal has prohibited Plaintiff from adequately representing Plaintiff's interest and resulting in a one-sided version of events to support the conclusion that Defendant wants reached.

93.     Additionally, it flies in the face of logic and reason that due process can be accomplished when the Chief Judge is responsible for approving any termination before hand, and then the Chief Judge is also responsible for being the final decision maker in a "non-economic" grievance. Due process cannot be accomplished when you are allowing the ultimate decision maker to determine whether that decision is proper in the grievance procedure.

94.    In this case, Defendants are state actors subject to the Fourteenth Amendment. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

95.    The municipal defendants and subdivisions are state-affiliated institutions acting under color of state law, unlawfully deprived plaintiff of his property interest by unilaterally and willfully terminating him without just cause, when the harm to Plaintiff from such action was foreseeable. Defendant's unilateral termination of Plaintiff' employment under such circumstances arbitrarily deprived Plaintiff of his property interest without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

96. As a direct and proximate result of defendants' actions, Plaintiff has suffered economic and non-economic damages, including lost wages and benefits, pain, suffering, embarrassment and humiliation.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Award plaintiff all back and front wages, benefits, bonuses and other compensation due him as a result of the wrongful conduct of defendant;

B.  Award plaintiff compensatory, punitive and/or exemplary damages on him claims against defendant;

C.  Award plaintiff prejudgment interest;

D.  Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees; and

E.  Award plaintiff such other and further relief as this Court deems appropriate.

## COUNT IV
## Breach of Contract - Collective Bargaining Agreement ("CBA")

97. Plaintiff hereby restates, re-alleges, and incorporates by reference each allegation set forth above.

98. At all relevant times, plaintiff's employment was subject to a "good cause" standard as contained in the CBA which provides that an employee may not be terminated without "good cause and notice." (Ex. 2, Art. XXIV, Sections 2(a))

99.     The CBA also has "built in" progressive discipline and provides in pertinent part: "Disciplinary actions, when deemed appropriate, shall range from verbal warnings and/or counseling to discharge"; it also recognizes "serious" cases "that warrant immediate suspension or dismissal"; and while the employer has some discretion, it is not unfettered. (Art. XXIV, Sections 2(a), 2(b) and 2(d)).

100.    The CBA has two different grievance procedures outlined in it, one being an "Economic" procedure and another being a "Non-Economic" Procedure.

101.    The CBA defines "Economic" as "having a financial impact."

102.    The CBA defines "Non-Economic" as "not having a financial impact."

103.    There can be no dispute that Plaintiff's termination has "a financial impact."

104.    The CBA does not define "Economic" any more than that.

105.    The CBA does not say if the financial impact is financial impact of Plaintiff or Defendant. It also does not even define if it must be a negative financial impact. Plaintiff's firing without a doubt had a financial impact, negatively to Plaintiff, and positively to Defendant.

106.    Plaintiff therefore should have been afforded the opportunity under the CBA to proceed under the "Economic" grievance procedure, however Defendant refused to allow that and

Plaintiff was not allowed to do so. This is a direct violation of the CBA.

107.    The CBA allows payout of earned but unused vacation time "If an employee is discharged from employment for a reason considered by the Employer to constitute unsatisfactory performance rather than misconduct."

108.    Plaintiff should have been paid out his vacation in accordance with the terms of the CBA, but was not.

109.    The CBA requires there to be "good cause" for termination of employment. In this instance, there was not good cause to terminate Plaintiff's employment.

110.    For all of the above reasons, the CBA was not followed.

WHEREFORE, plaintiff respectfully requests that this Court:

A.    Award plaintiff all back and front wages, benefits, bonuses and other compensation due him as a result of the wrongful conduct of defendant

B.    Award plaintiff compensatory, punitive and/or exemplary damages on him claims against defendant;

C.    Award plaintiff prejudgment interest;

D.    Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees; and

E.    Award plaintiff such other and further relief as this Court deems appropriate.

## COUNT V
## DEFAMATION

111.    Plaintiff hereby restates, re-alleges, and incorporates by reference each allegation set forth above.

112.    Defendants' have made false and defamatory statements concerning plaintiff, including but not limited to, accusations concerning alleged acts or omissions he did not commit.

113.    The preceding referenced statements are defamatory because they are false and were created with the intent to harm plaintiff's reputation or with reckless disregard for the fact that they would inflict such harm. Defendants' managerial and/or supervisory personnel published the false and defamatory statement(s) concerning plaintiff (on information and belief) while acting within the scope of their employment for or on behalf of defendants. Therefore, the statements are attributable to defendants. Defendants' managerial and/or supervisory personnel acted with fault amounting at least to negligence in publishing the false and defamatory statement(s) concerning plaintiff.

114.    Defendants' have made blatantly false statements in an unemployment case, including referencing allegations of sexual harassment against Plaintiff, which are absolutely untrue. These allegations were included in court filings related to the unemployment case and filed within the past year.

115.    As a result of defendants' false and defamatory statements concerning plaintiff, plaintiff has suffered and will continue to suffer damage, including economic damages, damages to his reputation, and/or damage to his current and/or prospective business relations.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Enter a judgment against defendants for damages in excess of $75,000, plus interest, attorneys' fees, and costs;

B.  Order defendants to remove and retract all defamatory statements concerning plaintiff,

C.  Order that defendants must cease and desist and is enjoined from publishing the

defamatory statements concerning plaintiff, and

D.  Order such other and further legal or equitable relief deemed appropriate.

## COUNT VI
## VIOLATION OF MICHIGAN VETERAN PREFERENCE ACT, MCL 35.401, et. seq.

116.    Plaintiff hereby restates, re-alleges, and incorporates by reference each allegation set forth above.

117. Plaintiff is an honorably discharged veteran from the United States Army, and therefore the Michigan Veteran Preference Act (MVPA) applies.

118.    Defendants refused to allow Plaintiff to invoke the protections of the MVPA.

119.    Plaintiff was entitled to a hearing before the Prosecuting Attorney as outlined in MCL 35.402.

120.    Plaintiff was entitled to a "full hearing", but was given none, under the MVPA.

121.    Plaintiff was only subject to termination for "official misconduct, habitual, serious or willful neglect in the performance of duty, extortion, conviction of intoxication, conviction of felony, or incompetency" as outlined in MCL 35.402.

122.    Plaintiff did not commit any of the enumerated items, and therefore could not be terminated.

123. As a result of defendants' failure to comply with the law, Plaintiff did not receive the due process he was entitled under the MVPA.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Enter a judgment against defendants for damages in excess of $75,000, plus interest, attorneys' fees, and costs;

B.  Order defendants to comply with the MVPA.

**COUNT VII**
**VIOLATION OF BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT,**
**MCL 423.501, et. seq.**

125.     Plaintiff hereby restates, re-alleges, and incorporates by reference each allegation set forth above.

126.     Plaintiff is seeking, *inter alia*, declaratory and injunctive relief pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL 423.501, et. seq., compelling defendants to remove the false information from plaintiff's personnel file, as well as damages, attorney's fees and other appropriate relief.

127.     The allegations in plaintiff's personnel file are false and defamatory.  Not only are the statements and allegations false, but the circumstances also surrounding their creation are false.

128.     The Act (MCL § 423.501) provides that "[i]f …the employer … knowingly places in the personnel record information, which is false, then the … employee…shall have remedy through legal action to have that information expunged." MCL § 423.505. The Act further provides that "[i]f an employer violates this act, an employee may commence an action in the circuit court to compel compliance with this act." MCL § 423 511.

129.     Additionally, the Defendants should be barred from using any information that was not in the Plaintiff's personnel file in accordance with MCL 423.502 in any judicial proceeding. Defendant produced a personnel file to Plaintiff in response to a request under the Act, yet it appears Defendant maintained some type of "secret" personnel file with other notes and information because Plaintiff is bringing up and using multiple things not in Plaintiff's personnel file to try to justify Plaintiff's wrongful termination. Defendant should be ordered to remove all of

this information from Plaintiff's personnel file since it is being created after the fact and was never in the Plaintiff's personnel file to begin with.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Order defendants to expunge and/or otherwise remove the false information from plaintiff's personnel file pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL § 423.505;

B.  Award plaintiff damages on his claims against defendants under MCL § 423.511;

C.  Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees pursuant to MCL § 423.511(a)-(b); and

D.  Award plaintiff such other and further relief as this Court deems appropriate.

## COUNT VIII
## VIOLATION OF MICHIGAN CONSTITUTION SEC. 17 DUE PROCESS CLAUSE

130.   Plaintiff hereby restates, re-alleges, and incorporates by reference each allegation set forth above.

131.   The Michigan constitution indicates that no individual shall be deprived of life, liberty, or property without due process of law.

132.   This entire discipline process has been a sham and has deprived Plaintiff of his liberty interest and property interest in continued employment guaranteed through the Michigan constitution.

133.   For all of the reasons outlined above, Plaintiff was not allowed due process of law.

134.    This includes, but is not limited to, not being allowed to call witnesses, introduce evidence, review evidence, confront accusers, present a meaningful defense, having a meaningful hearing, being prohibited from invoking the provisions of the MVPA, being prohibited from invoking the economic grievance procedure in the CBA, and other violations as alleged in other counts of this complaint.

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Award plaintiff all back and front wages, benefits, bonuses and other compensation due him as a result of the wrongful conduct of defendant

B.  Award plaintiff compensatory, punitive and/or exemplary damages on him claims against defendant;

C.  Award plaintiff prejudgment interest;

D.  Award plaintiff his costs and expenses incurred in bringing this action, including reasonable attorney's fees; and

E.  Award plaintiff such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL
Plaintiff hereby demands trial by jury on all of these counts.

Dated:  April 10, 2022                                    Respectfully submitted,


/s/ Joshua Wise
Joshua Wise
7658 Sunrise Bluff Ln
Zeeland, MI 49464
616-403-1541
Plaintiff